The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is Magnus Aadland v. Boat Santa Rita II, Incorporated et al, Appeal No. 20-2073. Attorney Lange, please unmute your audio and your video at this time and proceed with your argument. Thank you. May it please the Court. Good morning, Judge Thompson. Good morning. Judge. We're not hearing a term. We need a co-counsel in this matter, Katherine Kramer. We both represent the Plaintiff Appellant, Magnus Aadland. I'd like to request from the Court the reservation of three minutes of my time for rebuttal. You may. Thank you, Your Honor. First, we rely on the statements that we made in our brief and our reply brief that we've submitted to the Court on behalf of Mr. Aadland. Today, though, I'd like to accent some of the arguments that we think are extremely important. The first thing that we would say is that we believe this case is a matter of first impression. We think that this case had a fact pattern that is different, not seen before in the First Circuit, and quite frankly, not seen before specifically in the United States. This was a case in which our client, Mr. Aadland, who was a captain on the fishing vessel Linda, which is owned by BSR-2, was taken ill in July of 2014 while in the service of the vessel, and there's no doubt about that. In fact, that was stipulated at trial. There are certain things over 200 years of maritime law that would kick in immediately upon a seaman being injured or becoming ill while in the service of the vessel, specifically maintenance and cure. In this particular situation, we had a claim that Mr. Aadland was never afforded a cure in this matter. Now, he may have been afforded a version according to the defendant's plea of a cure, but in fact, he was not afforded any cure from the standpoint of any definition that we've seen before. What happened in this case was that Mr. Aadland proactively with his wife had a private health insurance policy with health insurers. Can I ask you, at what point did he ask the defendant to pay the medical bills? I would say this, your honor, twofold. First, I believe a cure is an absolute duty, and I believe that the cases are clear that there is no requirement, specifically the Iroquois case, which goes back over 100 years. The question, excuse me. You have to ask for a date. But I can tell you dates. Counselor, Mr. Lang, Judge Hawkins is trying to talk. The question asked for a date. Well, I would say this, in October of 2014, it became very clear to the vessel that, in fact, the private insurer was picking up all of these bills, and I believe that they were paid. Was there any point prior to the filing of the suit in which a request was made of the defendant to pay the medical costs? Judge, I want to apologize because we have a little bit of lag because I'm going through the phone, and I sincerely apologize if I talk over any of you, and by looking at you closely, I'll understand that you're speaking. But I want to say this. Let's do it this way. When did they specifically know that they should have provided a cure? You're answering questions that I'm not asking, and if the answer is there was never a time in which there was a direct request or even an implicit request, that's fine. Just tell me that. If there was a time in which you made prior to suit, what was that date, and then where in the record would I find evidence that that request was made? So, I would say there was never a date in which my client said, we need our medical bills paid. I would say that if you look at, and I'm going to give you the cure, beginning with appendix numbers 699, 700, 701, 02, 10, 11, 14, 15, 16, 718, 19, 23, 27, 28, and 29, in which they specifically internally discussed that they would not go out and offer cure because they did not want to interfere with Tufts paying the bills. So, they secreted themselves, and at the same time, they... That's very helpful. I have one related question, which is, what are you asking for in terms of the amount of cure? I assume it's not the total amount of the medical bills, which Tufts has paid. It sounded from your brief like you were saying you wanted some compensation for the premiums paid for that insurance. Is that the amount? Your Honor, if you look at the Gotthier case and Gotthier 2... We're going to go in the same direction we just went before. I'm just asking a very factual question. What are you looking for? What are you looking for? It's our position that under the case law, the vessel is not entitled to a set-off. So, when we presented this... I just want to know the number. Is it the amount of the premium? Is it the total amount of the medical bills? Is it the entirety of the premiums paid? Is it some portion of those premiums? What is the number? We believe that he incurred $1.2 million in medical bills, Your Honor. Tufts, by way of contract, paid $602,000. So, we believe that if you look at the case law, that's what he incurred, Your Honor. Counselor, your argument is that the collateral source rule is inapplicable to cure. So, once again, just to pin things down, you believe that you are entitled to the total amount of medical bills, period, with no kind of set-off, and you also don't believe that that constitutes a windfall. We believe, Your Honor, we believe this, and we pose this to the court. We're not sure what the result on the set-off should be in this case because we don't believe it's ever happened before. What's your argument? Excuse me, Your Honor. What is your argument? If you don't know, we're looking to you to help us out here. What is your client's legal position? According to case law, they would be entitled to no set-off. Tufts bought these bills for $602,000 and the vessel bought the lien for $400,000. So, at the very least, there's a delta of $202,000 between what the vessel paid and what the vessel, if they had had the same contract rate as Tufts, would have paid. So, the windfall went to the vessel, certainly not to my client. As far as the case law goes, they say there's no set-off when a seaman proactively buys... Let me ask you this way. What is the out-of-pocket amount that your client paid for the medical bills? My client paid about $2,000 a month, Your Honor, and the medical bills went on for approximately... So, that's the premium amount? Yes, Your Honor. There's no other out-of-pocket expense in the case? He was paid by the vessel his co-pays, which was about $5,300, Your Honor. What the vessel did... I'm sorry. Yep. So, if we didn't buy the argument that he was entitled to now recoup as cure payments for medical bills that he did not pay, that he did not directly ask the defendant to pay, I take it what's left then is the premiums he paid for the insurance that enabled him to have the medical bills paid, and you're claiming that that out-of-pocket expense falls within cure. Is that right? They specifically deferred his medical bills to a private insurer, so the answer to that would be yes, Your Honor. Okay. And is the idea that although that insurance was paying for... Those premiums were providing him insurance that would cover much more than those medical bills, he's nonetheless entitled to the entirety of the premium as cure? In this particular case, 80% of the medical bills were incurred the first time he was in the hospital, and he wasn't being treated at that time for... First of all, Tufts had an exclusion for work-related injuries or illnesses, so Tufts actually paid it. It wasn't inside their contract, and that really is the purpose of something we'd like the court to address, because if you allow, in essence, employers to divert their responsibility, and in this case, cure, to a private health insurer, it will collapse the whole notion of private health insurers fighting for non-work-related type illnesses or injuries, but work-related injuries are on the important page. Let me just put it this way. This is what I'm not fully understanding about what your argument is. I get sick on a ship. I have a rich aunt. My rich aunt says, don't worry about it. I'll cover all your expenses. I say, thank you very much. They're all paid for. At the end, I then sue the owner of the ship saying, I know all my expenses were and happily so. I'd now like you to pay them on top of that. I take it you agree that in that circumstance, you can't get the ship to now pay all the money that the rich aunt paid. I agree. There are several cases exactly on point, yes. Okay, so what I'm having a little trouble here figuring out is how exactly this case is different. One point that seems different is that unlike in my hypothetical, your client had to pay the premiums to get the payment. They didn't have a rich aunt. They only had an insurance company that was charging a premium. That might suggest that you could recover the premium, but I'm not sure that's what you've ever asked for below in any clear way or what that amount would be. That amount would be $2,000 a month. I think that if that was the case, then what we would be saying is that the employer can require each fisherman, each seaman to have their own private insurance, and then tell them specifically, put an injury from the ship onto that private insurance. It wouldn't be that it could require them. It would just be that if it did that, just like it can't require them to have a rich aunt, but if they have one, that matters. Well, actually, you would begin to require them because in states now, in Massachusetts, they're requiring health insurance. You would divert your responsibility to the injured seaman, to a sick seaman, to a private health insurance plan, and sure it would no longer exist unless you did not have insurance. Not if you don't make the claim to the insurance company, you make it only to the ship. What I'm saying here, though, is that the ship in this case specifically diverted their responsibility, their absolute duty to be private insured, and they knew what they were doing. This is interesting. Normally, we would argue about, well, do we really know what they did? They put it all in writing. Because they did not do it in anticipation of litigation, it came in in discovery. Judge Dean indicated they had to turn over all the records. What I cited to you in the appendix shows they knew exactly what they were doing. They basically said, we don't want Tufts to know. We can't ask for medical records because Tufts will then know that we're the primary source. They were warned by their Lloyd's of London policy that you cannot do that. That is against all case law in the U.S. You cannot divert your responsibility to a private insurer. Mr. Lane, let me ask you a question, please, and I don't know if the record is silent on this point, but usually the first question when you seek medical attention is whether the injury that happens whenever you check into the hospital, whenever you go to the doctor, did your client list this as a work-related injury at the time he was hospitalized? I would say that the answer to that, Your Honor, is no, but it was stipulated that it was work-related. I would tell you that when he went to the hospital, he was in critical condition. The boat knew about this incident. The wife met him at the dock with an ambulance, took him to the emergency room here in New Bedford, then they took him to Leahy. The hospital said, well, what's your insurance card? They gave him their insurance card. That happens all the time in a work-related injury, and then the insurance companies sort that out. In this case, the vessel that had the insurance did not in any way indicate that they were the ones who were responsible, that they would pay it to my client. They said it to each other though. They specifically put this plan together that they would avoid $1.2 million worth of meds. We got that point. Judge Barron? I just have one last question, which is, I take it with respect to the premium payments, which were out-of-pocket expenses that have not been paid for by anybody other than your client. You say that the advances that he received don't constitute sure, because it was contingent in some way, right? There's a contingency that he might have to pay it back. Now, as I understand the record, that contingency hasn't in fact been exercised or acted on by the defendant in any way that suggests the advances have to be paid back, but I understood you to be making an argument in your brief that there was a compensatory harm from the anxiety or emotional concern about whether he might have to pay them back. Is that right? Twofold. First, that's correct, but secondly, the advance didn't start until December 29th, 2014. This injury and everything occurred beginning in July of 2014. Is there an amount of premium that was not covered by the advances? The amount of premium not covered by the advances would be, Your Honor, that period of time, at the very least. The other thing is... How much is that? How much is that, dollar-wise? Dollar-wise, that would be six months, so $12,000, Your Honor. Okay. But the emotional damages is what you're also seeking for that? Of navigating through a health care system instead of having a cure, which I think would have been much more direct. And was that argument made below? It was, Your Honor, but may I say one last thing that is important? If you want to understand the advances clearly, there are receipts that specifically show the advances in the record. The advance says that it's contingent upon an award or a settlement, and that is for a Jones Act case, a tort case. That's standard in the industry. They basically pay out and then they subtract it from whatever the settlement is. The receipt for maintenance specifically says for maintenance and cure, or for maintenance, rather, doesn't mention cure. There's no mention of cure anywhere other than in their private notes. Thank you, Counselor. Any other questions? I have one quick question, which can be answered with a yes or a no. Did your client present any medical bill to BSR that they did not pay? Out of pocket, no, Your Honor. Thank you. Thank you, Mr. Lang. At this time, if you would mute your video feed and your telephone. And at this time, if Attorney McSweeny would please unmute his audio and video and introduce yourself to the court, please. Good morning, Your Honors. May I please the court, Francis McSweeny, for the appellees, but in particular, both Santa Rita too. Before I get going, Mr. Justice Barron had a few questions that I think I'd like to just start off by addressing. I don't know if they were answered explicitly. They relate to, I believe, the advances that Mr. Odlund was receiving and the premiums that he was paying. The question of the premiums, it was about $2,000 a month. It actually changed somewhat over time. There are periods in which Mrs. Odlund was working for GAF Engineering still while Mr. Odlund was in the hospital. During that time, her employer was paying a portion of the premiums. Following her termination or separation from work in about September of 2014, the Odlunds were paying, I believe, the $1,000 or so a month. The premium did increase over time, and they were factored into the advance payments that the defendant made. Counselor, I'm curious as to why, knowing that you had this legal responsibility of maintenance and cure, you didn't offer it to him right away. There was some confusion initially, Your Honor. The St. Luke's medical records, the first place that the plaintiff was treated when he was brought in from the boat was St. Luke's Hospital. He had to be stabilized there before he could be moved to his treating physicians at the Leahy. At the St. Luke's Hospital, there were some medical records indicating that he'd suffered potentially a bug bite, and that might be the source of the infection a week prior to the trip when he was in Maine. The question of whether that bug bite was the cause of the infection... But if he felt ill while at sea, the bug bite didn't really matter, did it? I guess the question was, did he feel ill prior to leaving for the trip? Because then if he felt ill at home and said, oh, I'm not feeling well, but I'm going to go on this. I don't want to miss the trip. I don't want to delay the trip as he was the captain. Then potentially he would not have been in the service of the vessel when the illness manifested. Is there any indication in the record of that? It's in the St. Luke's medical records. No, no, no. Any indication that he was ill before he boarded the ship? No, Your Honor. I think at the end of the day, and why we eventually did determine that it probably was a case, and it was a case in which we were obligated to pay maintenance and cure, was that it pretty quickly became apparent that it wasn't necessarily the bug bite. It was just that he had other health issues that made him more susceptible. In light of that, could you answer Judge Thompson's question about, at least at that point, why didn't you offer the cure? I mean, particularly since the boat was insured, that's what is so puzzling about this. It was discussed a little bit at the trial, Your Honor. There were some questions about whether or not Mr. Battagna, who is the owner of Boat Santa Rita II, knew or understood that it might implicate his obligation to provide cure. It wasn't until he was speaking with his insurance agent, or his broker, in about September of 2014, that he mentioned the oddland illness. The broker said that might be something that you should be paying cure for. It was around that time that the bug bite is no longer an issue in the case. But still, no money was forthcoming until December, right? Yes, Your Honor, that's correct. Under the doctrine of maintenance and cure, it's pretty well established, and this is also in the papers, that maintenance is not due while a seaman is inpatient in a hospital. For cure. Yes. For cure, correct. And at that point, his bills were being paid by Tufts, so there was no... But not by you. No, that's correct, Your Honor. Or not by your client. That's correct, Your Honor. But that gets back to whether or not a request was ever made for cure or maintenance, and there was never any request for cure. Well, what did you offer? I mean, you're the bone owner. Did you offer cure? It's not clear from the record whether we stepped in and said, do you want cure? There were points later on in Mr. Oddland's treatment where it came up in terms of settling or resolving the issues. As it became apparent how severe his injury was or his illness was, there were issues where... Discussions, rather, between Appellee's broker and the Oddlands, in which basically they were asking for the full 1.2 and that they would deal with Tufts. And at that point, it became clear that it wasn't going to they refused to provide any sort of medical bills or records so that we could evaluate the pain cure. Was your client... Excuse me. Go ahead. Was your client aware that when the boat returned to dock, there was an ambulance waiting that picked him up and took him to the hospital? Yes, they were, Your Honor. Mr. Petani was actually on the cape at the time, although he was in telephone communications with the boat and Mrs. Oddland. And also the boat, as I mentioned, the first mate took over the boat and made the decision to come into port, and he was in contact with the owner. So we were aware that he was going to get medical treatment at the dock and be taken to the hospital. Judge Barron? Was it required a broker to tell him that he had this responsibility as the owner of the boat? I'm sorry. Hang on. Something is going on, Jim. Jim, what was going on? We're muting a few people. Their microphones were left open, Judge. I'm sorry. That's okay. Okay. Can we proceed now? Yes. Okay. Judge Hawkins, could you ask your question again, please? Sure. So your client was aware that he was, Adlon was picked up at the dock in an ambulance and taken to hospital, correct? I can't, you must be muted. I can't hear you. I'm sorry. Yes, Your Honor. And shouldn't that have been when the responsibility for cure began? Knowing what we now know, I would agree that, yes, that's the point in which cure would begin, Your Honor. I think, again, at the time, the vessel owner didn't understand the illness to be something, you know, in a case where someone breaks their leg on the boat or suffers an actual work-related injury, it's obvious to anyone that cure begins. This is the first time that this owner had dealt with an illness manifesting in the service of the that the seaman was performing. But your client didn't know anything about bug bite at the time he was picked up at the dock? Not at the time, no, Your Honor. That came out when the St. Luke's records were received. So obligation attached. Go ahead, Judge Hawkins. No. A perfectly otherwise healthy captain gets on the Santa Rita, goes out to sea, the first mate realizes he's impaired, brings the boat back to dock, he's picked up at the dock by an ambulance, and your client has to consult a broker to find out their cure obligations? Just in terms of the facts, Your Honor, there's some variation there. Mr. Rodland's health prior to, it wasn't exactly perfectly healthy. Mr. Rodland was, at that point, he was the captain and had been a commercial fisherman for several decades. So he was somewhat older in terms of the relative age of commercial fisherman, and he had some pre-existing conditions. He was overweight and had some issues with cellulitis, which the medical professionals eventually determined was a source of the infection. So to the extent, he did become impaired on the boat. Gradually, at first he was saying, don't come back in. It's just the flu or something to that effect. But then when he couldn't leave his bunk, that's when the mate made the decision that the trip had to be stopped. As for why the owner didn't immediately realize that that's when the obligation to provide a cure sprang in and didn't proactively go out and say, no, Tufts don't cover the medical bills. We'll put this through to our insurer. Because of Mr. Rodland's condition at the time he arrived at the dock, he required immediate medical attention, at which point Tufts began paying without question. Five minutes remaining. Five minutes. Let me just try and separate out what are these two things, which is liability and damages. Correct. Yes. Regardless of whether the medical bills themselves were paid by someone other than the plaintiff here, I take it his contention is that with respect to liability, there's a duty to cure and that duty was breached by never offering to cure, such that he then had to rely on what can be a difficult process of getting his wife's insurer through her employer to pay for this with all the issues about whether it's covered or not, etc. And that as to damages, the harm that he suffered is the emotional toll it took of negotiating that process, all of which would have been alleviated had the cure obligation, which you don't dispute existed, been complied with. So that's one line of argument that I understand the plaintiff to be making, which I'd like you to address. The second one is related to that, which is even if the payment of the medical bills themselves was all made by a third party, and I take it the evidence suggests that it was, the payment of the premiums that enabled those bills to be paid was not. And so the question remains as to that, why doesn't the cure obligation at least run to the premiums? I will address the second question first, and the second question second, or the first question second, just because it's a little easier to answer your second question as to why the premiums were not paid. They were, it was considered in the advances. Do you agree that there's that $12,000 amount that the advances don't cover or not? I disagree, Your Honor, because as I said, there was an issue of how much the premiums actually were at the various points throughout the early treatment. So then let me just understand your argument. You're agreeing that if there were any amount of the premium not paid, that would fall within the cure obligation? Yes, I would agree with that, Your Honor. Okay, and then so if you can address that other question that I asked about the harm of having to negotiate it when not asked, because that is related, I take it, to their fallback argument with respect to the premiums. That the advances aren't cure because they were contingent, and therefore, the emotional damages that he's seeking for not carrying out their cure obligation applies there as well. So to the extent the Adlins were required to negotiate with the insurance company or fight coverage and that caused some compensatory damages, I believe, as I mentioned, and this sort of came out in some of the other questioning that some of the other justices had asked earlier, the issue was Tufts began paying immediately from the early bills. But what I want you to address is the liability question of why didn't your cure obligation impose on you a duty to offer cure, which was never offered, such that if you'd wanted to take that up, he could have done so. And while it's true, there's no damages from that failure to offer it if there is such a duty because they were paid by Tufts. Nonetheless, there are damages in the form of the harm that he claims he suffered from never having been offered that option and instead having to negotiate with the insurance company. What's your answer to that? Thank you. I think I understand your question better now, Your Honor. My answer to that is that by the time issues arose of the Adlins having to deal or fight with the insurance company, we were paying maintenance and advances. It was $84 a day in maintenance and $114 per day in which at that point included the premiums. You're still, I think, focused on the fact that there was no harm to him. But I'm just trying to figure out, do you agree as a liability matter that your duty to cure entails a duty to offer cure such that the injured seaman can make a choice knowing, well, I've got somebody who has got this duty and acknowledges it. Therefore, I'll go that route or no, I'll go the insurance company route. I just want to know what's your position on that legal question about what the nature of your duty was and whether you breached it. I believe knowing what we now know, we probably would have insisted on paying the the way this case developed. We would have insisted on paying the medical bills because with respect to what was billed and what was actually paid by the Tufts insurance, we would have received a discount on that anyway in terms of when we pay and when we do step in and pay. We never pay the full medical bill. We pay more in line with what Tufts had paid. I'm asking a slightly different question than what you would have done in your own interest. I'm asking what your understanding of your legal duty was and whether your legal duty to cure entailed a duty to offer cure at the moment you knew he had become injured on your ship. I believe that the court is correct that there probably was a duty to offer a cure right away, but that not having been done initially and the way the facts played out, I don't know that it would have made a difference later on when we were providing the maintenance and it advances and the outlines were interesting. What's your answer to the concern that I have? As I read the district court's opinion, it didn't seem to share that view that there was a breach of the duty to cure and that notwithstanding that there was no harm. I don't think it's clear on that point, and therefore it doesn't seem to have addressed the claim about the emotional harm, the damages for the emotional harm of not having had that option. Maybe there is no basis for finding damages on that basis, but I don't really read the district court to engage with that question. I think, your honor, the compensatory damages springing and arising out of the failure to provide cure would fall under the count four, which was the willful failure to pay compensatory harm for the breach, wouldn't it be? They get lumped together, your honor. I'm trying to find the spot in our brief now where it's discussed, but there's generally speaking a sliding scale of liability, whereas if the failure to pay is willful and callous, then you can get punitive damages and attorney's fees. If it's unreasonable, then it can be considered for compensatory damages, such as you're talking about, about emotional harm, and where it's just you were obligated to provide maintenance and cure, but you failed to do so, but it was a reasonable failure where, as here, you have conflicting medical records and an insurer that was paying right away and no demand for cure from the appellant or the seaman. At that point, the court can determine that it was just your responsibility to then provide the cure, which at the end of the day, we did when we satisfied the lien for $400,000, and Osmond essentially did incur no out-of-pocket expenses for either his premiums, his treatment, or the out-of-pocket medical bills, which we did satisfy in the amount of about $5,200 for his prescriptions and such, but I think where he didn't actually incur any expense that he's now responsible for, the court determined that compensatory damages were not appropriate under that slight scaling, if that makes sense. Thank you, Counselor. Thank you, Your Honor. At this time, Mr. McSweeney will mute his audio and video, and at this time, Mr. Lang will unmute his video and unmute his telephone. Thank you. Mr. Lang, could you just introduce yourself for the record? Yes, Mr. Clerk. My name is Scott Lang. I'm on my rebuttal time, and I apologize. Our phone line crashed. We're back on. Your Honors, I have just a few things that I would like to address. The first is, Judge Barron, you had asked me before regarding the advance payments, and you asked where in the record, and what I would do simply is say that Appendix 724 through 726, and 755 and 756 outline how they saw their payment advance payments. We don't believe it had any relationship to cure. In addition, we believe that the plan that they put into place by their own hand is evidenced by Appendix 670 through 678, and then I indicated to you before, Your Honor, Appendix 699 through 729. We believe that it evidences that they were not stumbling through this. In real time, they were planning not to provide cure, and they actually had the windfall. Attorney McSweeny indicated that they would have paid medical bills with a discount, and not only perhaps, I don't know if that is true or not, perhaps they had a contract. They paid 602, but our special paid $400,000 to collapse that lien, so they had the windfall. The other thing I would say is this. This will incentivize other vessels to do the same exact thing. A butt bite, two weeks, three weeks, a month, whatever it might have been, at a certain point they knew that this injury came in service of the vessel. They should have stepped up and provided cure. The last thing I would say is that if you look at the findings, I'm sorry, the decision from the District Court, and if you look at the conclusions of law, number four in the conclusions of law switches the burden of who has to establish that an individual has reached medical maximum recovery or medical maximum improvement. It switched it from the vessel to Magnus Adlin. It also made a finding, the court made a finding here based on specious evidence indicating that he had reached a palliative plateau regarding his care, and this is something that the day before this decision came out, Judge Kelly in a decision in GF Fishing, I'm sorry, GJ Fisheries versus Amaral indicated that the burden, which is the case law around the country, the burden on MMR or MMI proof is on the vessel, not a double negative saying there is no evidence that Madeline had not reached maximum medical recovery. We ask that you look at the issue as well. We believe that this decision is extremely important for the future of the industry, the future of the safety of semen, and we ask that you please give it your consideration. Thank you very much, and I apologize for any technical errors. Ms. DeLange, before you go, back to the line of questioning that Judge Barron was pursuing, assuming that there was a cure duty that gave rise right away, you're claiming as compensatory damages that there was a certain amount of emotional distress resulting to your client because the boat didn't step up to its cure obligations. Could you just tell me what evidence you presented as to damages on that point? Yes, your honor, there was extensive testimony by Mrs. Adlin and Mr. Adlin regarding the difficulty they were having navigating through a bureaucratic health care process that limits the number of visits, limits the number of days, that moves people in and out. They went from Leahy to Bear Hill Nursing Home. The place they should have gone was Spalding. They ended up getting to Spalding at some point. He developed a serious reinfection while at Bear Hill. They testified to all of that and how, in essence, had they had one, had they had a cure, they would have had a much different experience, and experience means at that point it was life-threatening, but an experience psychologically through the process. Does it translate into a dollar figure? You know, your honor, I wish I was able to answer that. I would say that it's what a reasonable person would feel that someone would deserve who has gone through that, and I can't tell you, you know, I know that, you know, if I said you $250,000 for worrying that you, you know, you're not going to survive the next week because of the upheaval of going back and forth from different, you know, facilities, but I don't think it's fair for me to put a number on that. We presented it to the district court exactly as I did you. What was that worth from this point of having to go through this case arise in the way you're arguing? I understand why you're arguing as you are, but essentially the cure obligation of the ship becomes like an insurer, but how good an insurer? I mean, is it a plan in which whatever you ask for you'd get, or is it a plan like the Tufts plan where they're gonna say, well, maybe that's too many visits? In other words, you're suggesting that the harm arises from how much easier it all would have been if it was just a cure obligation, but we don't really know exactly what that cure obligation is. I mean, did it have an obligation to not require a transfer? Did it have an obligation to allow every visit the Tufts would have denied? I mean, how are we supposed to figure that out? And without knowing that, it's hard to say why the experience, if there had been a cure obligation, of how these bills would have been paid and how every request would have been met would have been absolutely seamless relative to what happened with Tufts. I would say there would have been a higher standard, Your Honor, had this cure been originally offered. I also think that there are many junctures in Mr. Lane, did you see the insurance policy? Did you see Lloyds of London's insurance policy and what their cure obligations under the policy would have been and whether it differed from what the terms of the Tufts plan was? I think that's what Judge Barron is trying to get at here. And what I would say is that while we didn't see the insurance policy, the standard for cure, I think nationwide, is that you provide the medical care needed for the recovery of the semen. And the Tufts policy is much more of a policy based on a number of visits, plateau. There was always a Tufts person at every juncture where they had to make a decision arguing for the next step down. And that was something that they testified to at length. When they thought they needed to go to a step-down hospital, the Tufts person said, no, you need to go to a nursing home. That's where he developed this next infection, which led to his operation in December. So it's all, the problem with this is it's conjecture from the standpoint of would he have had a better result if he had gotten a cure in the beginning, if they had the seamless type of medical care that we think cure would have provided. We think yes, but we can't stipulate on that. But we can say what the toll took on the people. They testified to it. They said that it was extremely, produced tremendous anxiety, tremendous depression. Magnus Adlin at one point, Mr. Petania went to visit him and basically said he was not in any responsive. The last thing I would say is this, Mr. Petania saw this in real time, went to see him several times. He offered, as our brief says, he offered prayers, he offered I'm with you, hang strong, whatever. At no time did he ever offer a cure or say, if I call my insurer right now, I think perhaps you'll stay, you'll go from Lahey to Spalding, which is a step-down where they will be doing tests on you all the time regarding your infection, rather than a nursing home where they basically say, if you have a fever today, we may call a doctor. So I think it was a tremendous turn. This is a pivotal case, I think, from that question. And I would think that the cure aspect will have to, if the cure aspect is we're going to do as little as we can, that's going to be the next case one day that comes before you. But this is a case that is so important because they deferred everything. He proactively bought his insurance policy. They deferred everything to that insurance policy. And that's something that should not have happened. And I appreciate greatly the time that you've afforded me this morning, Your Honors. Thank you, Counselor. Any other questions? All right. Thank you. Your Honor, Madam Justice, if I may just have one minute to just briefly make a rebuttal or actually answer the last question asked by the court, which was, what's the scope of the insurer's duty under the Lloyds policy? I believe I can be helpful in that. Well, this is a rather unusual request, but go ahead. I apologize, Your Honor. The scope of the defendant's, the appellee's responsibility under the cure obligation, it's actually determined by the case law. It's judicial law since it's the federal maritime law. And in the case of Whitman v. Miles, which is 387 F. 68, the appellee's or the boat owner's obligation is to provide the reasonably necessary medical expenses. As Mr. Lang mentioned, at each step of the process, Mr. Odlin's case was reviewed by Tufts' physicians who looked at whether or not the treatment that they were asking for was reasonably necessary. And with respect to the better facilities that he was requesting, the determination was made by Tufts' medical professionals that that wasn't reasonably necessary. And in the underlying case, Judge Casper determined that that was not reasonably, that reasonably necessary medical expenses were provided by Tufts. Thank you. Thank you, Your Honor. Counsel, is the case you just cited in your brief? It is, yes, Your Honor. Whitman v. Miles. That's all I need to know. All I need to know. Thank you, Your Honor. Thank you. Thank you. That concludes argument in this case. Attorney Lang and Attorney McSweeny, you should disconnect from the hearing at this time.